Tukley, J.,
delivered the opinion of the court.
Two causes are assigned on the part of the prisoner, against the affirmance of the judgment in the case.
1. That the caption to the record does not show where the court by which the bill of indictment was taken, was holden. The caption, so far as it is material - for the consideration of this question, is in- the words and figures following, viz:
“State of Tennessee:
Be it remembered, That on this, the 23rd day of February, in the year of our Lord 1846, being the fourth Monday in said mouth and the time assigned by law for the opening and holding the Circuit Court in Haywood county, in the town of Brownsville, State of Tennessee, John J. Sevier, Sheriff of Haywood county, and Joseph M. Rutledge, Clerk of said Circuit Court, met at the court-house in the town of Brownsville, and opened said court, and no Judge authorized by law to hold said court, appearing *13 before 4 o’clock, P. M., said court was adjourned until to-morrow, 10 o’clock.”
“ Tuesday morning, February 24th, 1848: Court was opened pursuant to adjournment; and no Judge appearing before four o’clock, the Sheriff and Clerk adjourned said court till to-morrow morning, 10 o’clock.”
“Wednesday morning, February 25th, 1848: Court opened pursuant to adjournment. Present, the Honorable John Read, Judge.”
Upon which a venire facias is returned by the Sheriff; and the bill of indictment upon which the prisoner was tried and convicted, was. regularly preferred by the Attorney General and found by a Grand Jury.
The caption to this record shows that on the day prescribed by law for holding a Circuit Court for the county of Haywood, State of Tennessee, the Clerk of the court and the Sheriff of the county met at the court-house, in the town of Brownsville, and there being no Judge present before four o’clock, P. M., they opened and adjourned the court till Tuesday morning, that on Tuesday morning there being still no Judge present till four o’clock, P. M., they again opened and adjourned the court till Wednesday morning; and that on Wednesday morning the court was opened by John Read, Judge, who was by law appointed to open and hold the same. Now if this record had showed that John Read, Judge, on the first day of this term opened the court at the court-house, in the town of Brownsville, for Haywood county, Tennessee, and then adjourned it till Tuesday, when he again opened it and adjourned it till Wednesday, when he again opened it, and the bill of indictment was regularly found, no one would have doubted but that it did legally appear when and where the court was holden by which the bill of indictment was found; for *14 if it appear that the court was opened at the right time, at the right place and by a person authorized to open it, the legal presumption is that it was opened at the same place for every other day of the term, which the record shows it to have been continued and held; for though by law a minute of the proceedings of each day shall be kept, and read by the Judge and signed by him every day, still in legal estimation a term is but one day, and therefore if it appear that the first day of the term was held at the right place, there shall be no inference or intendment that on any other day the court was opened and held at any other place.
The question then turns upon the authority of the Clerk and Sheriff to have opened and adjourned this particular term of the court, under the circumstances, on the first and second days thereof. Had they such authority? We think the Clerk had, under the provisions of the Act of 1817, chapter 131, section 1. By that, it is provided, “That whenever any Circuit Judge shall fail to attend on the first day of any term of any court, it shall be the duty of the Clerk of said court to adjourn the same from day tp day until the Judge shall attend,” &c., the Circuit Court being a court of record and minutes of its daily proceedings being required to be kept by statute, it necessarily follows that when the Clerk is empowered to open and adjourn it, (for the power to adjourn necessarily implies a power to open, for if it be not opened, it cannot be adjourned) it becomes his duty to make a minute of such opening and adjournment in the same manner as if it had been done by the Judge in person. It necessarily follows, then, that this caption does show that the court was opened and held at the right time and the right place, and that the bill of indictment was legally taken.
The presence and assistance of the Sheriff in opening *15 and adjourning tbe court, he not being authorized by law so to do in the absence of the Judge, cannot vitiate the act of the Clerk, who was.
, The second objection taken to the validity of the proceedings in this case in the Circuit Court, is, that illegal testimony, to wit, the declarations of the deceased against the prisoner were received by the court. The objection to this testimony is based upon the assumption that the testimony in the case does not warrant the conclusion that the deceased was in articulo mortis, or, as it is more often called, in extremis, at the time the declarations were made, and was conscious of the fact. The prisoner is indicted for causing the death of his wife by administering to her arsenic. The proof shows that the deceased was taken sick about the fourth or fifth of September, 1845, of fever, and died on the 2nd day of October, 1845. Between these two periods, the arsenic, if administered, was given. It appears, from the testimony of the attending physicians, that the attack of sickness was a common bilious fever, of mild form in its-commencement, that the fever was broken several times during her sickness, and that she as often relapsed, but that she eventually became convalescent and was considered to be recovering; but on the morning of the 19th or 20th of September, she was found by her physicians, upon visiting her, vomiting a green viscous matter and purging blood, and complaining of great thirst and a burning sensation in her throat and stomach, with pain in her stomach which was aggravated by pressure. These symptoms attended her more or less until her death, which occurred, as has been observed, on the 2nd day of October;
At some period between the 19th of September, and the 2nd day of October, time not specified in the bill of exceptions, nor to be ascertained from any other source, the *16 deceased told the attending physician that she was satisfied she could not live; that it was unnecessary to try to do any thing for her, that he could not cure her; that he did not know what was the matter with her; that she had taken a dose that was killing her, that she could tell who gave it to her, but she would not, and that there was a spell upon her of which he could not cure her. Now, though this testimony does not contain a direct charge against her husband, that he had administered poison to her, yet it does that she had been poisoned, leaving it as a matter of inference by whom it..had been done. And from a statement in other portions of the proof it"will be seen how strong that inference became that it was her husband, and what a powerful influence this charge and insinuation must have exercised upon the jury in their deliberations upon their verdict.
The paramour of the prisoner, a woman of infamous character, had sworn that he had informed her that he had administered the poison to his wife in the shape of .pills prepared for her by the doctor; that his wife refused to take them till he had pretended to take some' of them before her; and the attending physician, - also, states that the prisoner, on one occasion, stated in the presence of his wife, that she had refused to take the pills he had left, unless he would take some of them first, which he did. Now, these two -statements proven by these witnesses, establish the fact, that the deceased was apprehensive that her husband would poison her]' and necessarily drive home to him the insinuation that he was the person alluded to when she said she could tell who had given her the dose that was killing her, and whom she declined naming: and, in our opinion, this would have as much weight with the jury as if she had directly charged him with having administered to her the poison that was killing her.
*17 When we consider tbe charges of the woman, who is the only direct witness against the prisoner, and the strong probability that a jury would not have found him guilty upon her uncorroborated testimony, it is manifest that the fact of a direct charge made by the deceased against him would be tremendously operative in giving weight and strength to her evidence, and would incline the jury to give full faith and credit to it; it therefore, became highly important that the Circuit Judge, in favor of life, should have guarded carefully against the reception of these declarations on the part of the deceased, and have excluded them unless he was well and conclusively satisfied that they were the declarations of a person in extremis and who knew herself to be so, at the time of making them, and this the more especially as they make no direct charge against the prisoner, but only deal in insinuation.
Testimony of this character is only admitted from necessity, and an abuse of it is guarded against by the law with most minute particularity. There is no one principle better established that such declarations shall not be received unless the proof clearly shows that the deceased was in extremis (perhaps the words in articulo mortis which are used by some of the authorities to express this condition, are more accurate,) and that he or she, at the time of making them, was fully conscious of that fact, not as a thing of surmise and conjecture or apprehension, but as a fixed and inevitable fact.
And of this, the Judge is to determine, alone, without the aid of the jury; for the jury shall not hear such declarations till the Judge has determined that they are dying declarations,’ lest, peradventure, they may control their judgment, although, upon hearing other proof, they may become satisfied that they were not dying declarations. It *18 is dying declarations as such that are admitted; not declarations which may be dying declarations, or, not, as the case may afterwards turn out. The necessary consequence is that if a judge permit declarations of a deceased person to go before the jury as dying declarations and the proof does not show satisfactorily that they were such, it is error for which this court can and must reverse, and that too, whether they were objected to or not by the prisoner upon the trial; for the testimony being of such a dangerous character, watched with such jealous suspicion and the question as to the propriety of receiving being vested alone in the judge, it is his duty as counsel for the prisoner, to exclude it, if, in his opinion, it be not legitimate, whether its reception be objected to or not; in fact, the implied acquiescence in the reception of testimony generally, resulting from the absence of objection, cannot be predicated of such testimony as this, for its validity depends upon the fact, that the declarations were dying declarations within the meaning of the law, and if they were not, the reception of them is, illegal, and this illegality could not have been removed upon objection taken thereto, which peradventure may be done as to testimony of another character, or at least, proof of a legitimate, character be introduced to the same fact; neither of which, in the absence of an objection may be thought of, and therefore as a general rule if testimony going to establish a fact be not objected to, the reception of it will constitute no good ground for a reversal.
Let us proceed to examine what the law holds to be dying declarations and as such, admissible upon the trial of one for murder.
In Norris’s edition of Peak, on evidence, page SO, it is laid down as a principle “that in prosecutions for murder *19 when the deceased, while in the declared apprehension of death, or in such eminent danger of it as must necessarily have raised that apprehension in his mind, has made a relation of the manner in which the offence was committed, such relation has been received as evidence against prisoner, though the person making it was not finally sworn; for as is observed by Lord 0. B. Eyre, in a case of this kind, “when the party is at the point of death, and when every hope of this world is gone, when every motive to falsehood is silenced and the mind is induced by the most powerful consideration to speak the truth; a situation áo solemn and so awful is considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a court of justice.”
In the case of King vs. Commonwealth, 2nd Virginia cases, 78, 80, the court said: “declarations of a dying man have sometimes been received; but then they must be the declarations of a dying man or one so near his end that no hope of life remains: for then the solemnity of the occasion is a good security for his speaking the truth, as much so as if he were under the obligation of an oath. But if at the time of the making the declaration he has reasonable prospects or hope of life, such declarations ought not to be received, for there is room to apprehend he may be actuated by motives of revenge and an irritated mind to declare what possibly may not be true.”
In Cowan & Hill’s edition of Phillips on evidence, in note 453, page 607, vol. 2d, the law is laid down as follows: “Before the judge decides he hears all the deceased said respecting the danger in which he considered himself; and he should be satisfied that the declaration was made under an impression of almost immediate dissolution. It is not enough that the deceased thinks he shall not ultimately *20 recover. Thus, the deceased being operated upon by a quack surgeon on the 10th of May, by which he received an injury, took to his bed and died in about a week, in May, the 17th; on the evening of the 10th, he declared to a surgeon that he had such an injury in his bowels that he should never recover; the surgeon endeavored to encourage him, really thinking him in no danger of dying; but he still persisted in saying he felt satisfied he should never recover; but the judge who tried the case rejected his proposed declarations as evidence against the quack, who was indicted and on trial for manslaughter: Rex vs. Van Butchell, 3rd Carr & Payne, 629.”
In the case of Rex vs. Callaghan, McNally’s evidence, 385, Bosanquet, Judge, said: “To render a declaration of this kind admissible, the deceased must have had the impression on his mind of an almost immediate dissolution.”
These are as many authorities upon this question as we deem it necessary to quote. To enter into a more extended examination of the different cases, as might well be done, would be both tedious and unnecessary. Those already cited, lay down the positions assumed heretofore in this opinion, clearly and satisfactorily, and they are well supported by an innumerable train of other decisions, and contradicted by none which has been well considered.
They establish, . that declarations, to be considered as dying declarations and receivable as evidence, must be made by one in articulo mortis and in apprehension of an almost immediate death, as is held in Rex vs. Van Butchell. and not a mere despair of ultimate recovery after a lengthened illness. It is not necessary that these apprehensions should be embodied in language by the deceased to a bystander, but it will be sufficient if the danger be so eminent and immediate, as to satisfy the judge that the *21 accused must of necessity have been laboring under an impression of almost immediate dissolution.
Let us apply these principles to the case under consideration: was the deceased in articulo mortis at the time of her declaration to the physician? She was certainly in her last illness, for she died a few days after they were made, but how long, it is impossible to ascertain with precision as has been observed, because the exact time when they were made is not specified in the record, but it was most probably eight or ten days, for it was about the 20th of September, that she appears to have been taken with the violent symptoms which continued till her death, on the 2nd day of October; it was between these two periods that they were made, and whether she were in articulo mortis or not at the time would depend very materially upon the fact, whether they were spoken near the close of her disease, or shortly after the symptoms became more aggravated. The doctors do not say she was in extremis at the time, and they appeared to have entertained no suspicion that she had been poisoned. It is therefore impossible to say from the proof that she was in a dying condition at the time she made the declarations implicating her husband.
, But if she were in such condition does the evidence show that she, at the time she made the declarations, was under the impression of almost immediate dissolution? Surely not. The only evidence of this fact, is her assertion to the doctor, that she was satisfied she could not live. How uncertain a test this is every one who has attended on a sick bed, knows. How many are daily confined with sickness who are in the constant habit of exclaiming, OhI I am certain I shall die, I can never recover; when neither they or any body else have any apprehension, whatever, of *22 a fatal termination of the disease? It would never do, then, to hold that the mere expression of such an opinion on the part of a sick or wounded person is sufficient evidence of the truth thereof, but there must be something more, the evidence of a state of body from which it may fairly be inferred that the opinion expressed was confidently entertained. We have seen in the case of Rex vs. Van Butchell, that although the deceased, seven days before he died of the injury inflicted by the quack on his intestines, declared to his surgeon that he had such an injury in his bowels that he should never recover, and upon being encouraged by the surgeon persisted in saying he should never recover, his declarations against the quack were rejected because the court could not say that he was under the impression of almost immediate dissolution.
That is a much more favorable case for the receptiori of the testimony than this; there the expression that he should never recover, was not only once made, but reiterated when the surgeon attempted to correct the impression; here, the deceased says she is satisfied she cannot live. There is a great difference (and it is this very difference upon which questions of this kind always turn) between being satisfied that one cannot live, and being .satisfied that one is about to die; the one is fear, apprehension of death, the other despair; certainty of it; the one fears he may die, the other is conscious he cant live. But in addition to this, the manner in which the deceased spoke of her death satisfies us that she did not anticipate certain and almost immediate dissolution, or, in other words, she did not feel that the hand of death was upon her. She says, to the doctor, you can’t cure me, you don’t know what’s the matter with me; I have taken a dose that is killing me — there is a spell upon me which you can’t cure.
*23 Now, any one who is acquainted with the notions of ignorant people, about poisoning, can in these remarks almost hear the words of every such an one who may suppose themselves to have been poisoned. I have been dosed;t I have a spell upon me; I have been tricked; I must die; doctors cant do me any good; they don’t know what’s the matter with me.
Now, in such case no one believes that there is fear or apprehension of immediate death. That there is alarm and great alarm, there can be no doubt. Perhaps in the case of an ignorant person supposing himself to be under a spell or trick (which, as we know, is most generally an ideal supposition of being poisoned by some conjuring trick or in some mode by which all intelligent persons know cannot be effected) more than a person of sense would experience from having imbibed actual poison, unless it be of such a character and in such a quantity as must produce death.
But what is conclusive, as we think u.pon this question,, is, the doctors do not seem to have had any apprehension of her immediate death or any the slightest suspicion of her having been poisoned.
Then, upon a careful examination of the question and great deliberation upon it, we are constrained to say, that we do not believe that the declarations, as proven, were dying declarations; that not bring such they were illegal evidence and ought not to have been' received by the court.
We have carefully avoided expressing any opinion on the merits of this case, independent of this question; the case has to be re-tried by a jury, and we do not wish it understood that, we have, in this opinion, expressed any the slightest intimation as to the guilt or innocence of the *24 prisoner, of the offence with which, be stands charged. Let the judgment of the Circuit Court be reversed and the case remanded for a new trial.