IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 15, 2017 Session

## STATE OF TENNESSEE v. KAYLON SEBRON BAILEY

**Appeal from the Criminal Court for Hamilton County**
**No. 284116     Rebecca J. Stern, Judge**

_____

### No. E2015-01127-CCA-R3-CD

_____

Following a mistrial for juror misconduct, the Defendant-Appellant, Kaylon Sebron Bailey, was convicted as charged by a Hamilton County Criminal Court jury of first degree premeditated murder and possession of a firearm after having been convicted of a felony drug offense. See T.C.A. §§ 39-13-202, 39-17-1307(b)(1)(B) (Supp. 2011). The trial court imposed a life sentence for the murder conviction before sentencing Bailey, pursuant to an agreement between the parties, as a Range I, standard offender to a concurrent two-year sentence for the firearm offense. On appeal, Bailey argues (1) the trial court erred in admitting the victim's statements identifying him as the perpetrator of the shooting, and (2) the evidence is insufficient to sustain his convictions.[1] We affirm Bailey's convictions but remand the case for entry of a corrected judgment in Count 1 reflecting an indicted and conviction offense of first degree premeditated murder in violation of Tennessee Code Annotated section 39-13-202 and a corrected judgment in Count 2 reflecting an indicted offense of possession of a firearm after having been convicted of a felony drug offense in violation of Tennessee Code Annotated section 39-17-1307.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed
and Remanded for Entry of Corrected Judgments**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Wesley D. Stone, Knoxville, Tennessee (on appeal); and Zachary Newman, Chattanooga, Tennessee (at trial), for the Defendant-Appellant, Kaylon Sebron Bailey.

---

[1] We have consolidated and reordered the issues on appeal for clarity.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; M. Neal Pinkston, District Attorney General; and Bates W. Bryan, Jr., and Jason D. Demastus, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

**Procedural History.** This case followed a long and circuitous path before it was ready for review. After Bailey was convicted and sentenced in this case, trial counsel filed a timely motion for new trial, which was denied, and then a timely notice of appeal. After receiving notice from the appellate court clerk's office regarding his failure to file an initial brief in this appeal, trial counsel filed a motion for additional time to file his brief, and on January 13, 2016, this court entered an order granting counsel an additional thirty days. On the day before this brief was due, trial counsel filed a second motion requesting an additional thirty days to file his initial brief, asserting that he had been "busy in other Courts" and needed to prepare for "trials coming up in Criminal Court." On February 11, 2016, this court, after cautioning counsel that he had already received an extension of seventy-four days and that his grounds for relief were not well-taken, nevertheless granted the motion in part and gave counsel an additional ten days within which to file his brief. Thereafter, the State was granted two extensions of time for filing its responsive brief. Trial counsel then filed a motion for an additional thirty days to file his reply brief, alleging the same grounds for relief as in his previous motion in what appeared to be a "boilerplate motion for extension of time." On June 7, 2016, this court entered an order stating that while it did not doubt the veracity of the statements made by trial counsel in his motion, counsel had once again failed to provide a proper ground upon which to grant an extension of time to file a brief. It specifically observed that "[trial] counsel risk[ed] compromising his representation of the Defendant by filing motions based on grounds which have already been rejected by this court." The court also recognized that the case involved convictions for first degree premeditated murder and possession of a firearm and that trial counsel had raised twelve issues, six of which the State claimed were waived for failure to provide this court with an adequate appellate record to review, see Tenn. R. App. P. 24(b), and for failure to support issues with argument, see Tenn. Ct. Crim. App. R. 10(b). After noting that reply briefs should not be used to obtain additional time to file an initial brief in compliance with this court's rules and after cautioning trial counsel to be mindful of these rules, this court gave trial counsel an additional thirty days to file his reply brief.

After reviewing trial counsel's initial and reply briefs, this panel recognized some serious deficiencies in these briefs in its August 18, 2016 order:

> [W]e note that while [trial] counsel argues the evidence is insufficient to sustain the Defendant-Appellant's convictions for first degree premeditated

-2-

murder and possession of a firearm, the "Statement of Facts" section in both briefs consists of only four sentences that are without references to the record, despite the fact that the trial transcript spanned several hundred pages. Although [trial] counsel intermittently cites to portions of the record when referencing facts in his argument, he frequently and erroneously summarizes the facts from the Defendant-Appellant's first trial, which ended in a mistrial, rather the facts from the Defendant-Appellant's second trial. Moreover, despite an opportunity to do so, [trial] counsel never supplemented the appellate record with a transcript of the jury instructions that were the subject of several issues on appeal. Finally, despite the court's warning regarding the possible waiver of several issues, [trial] counsel failed to provide adequate argument, appropriate citations to the record, or applicable citations to authority in his reply brief. With the exception of one or two cases cited within the argument section of both briefs, the only legal authorities listed in support of [trial] counsel's vague assertions are contained in a "Table of Authorities Page," which directs this court to certain numbered issues rather than specific pages in the brief. When turning to these particular issues, however, it becomes apparent that the legal authorities listed in the "Table of Authorities Page" are not cited anywhere in the argument section for these issues, and this court is left wondering what relevance, if any, the listed authorities have to [trial] counsel's arguments. Because both briefs are essentially devoid of citations to relevant legal authority, the briefs also lack analysis of the applicable law to the facts of the Defendant-Appellant's case. We note that it is not the duty of this Court to act as the Defendant-Appellant's advocate, and we refuse to transform a wholly insufficient brief, through speculation or otherwise, into a brief that makes an intelligent assertion of grounds forming the basis of appellate relief.

Given these glaring deficiencies, we conclude that [trial] counsel's initial and reply briefs are distressingly inadequate. See Tenn. R. App. P. 27(a)(7)(A) (The brief of the appellant shall contain . . . [a] table of authorities, including cases (alphabetically arranged), statutes and other authorities cited, with references to the pages in the brief where they are cited[,] . . . [a] statement of facts, setting forth the facts relevant to the issues presented for review with appropriate references to the record[,] [and] [a]n argument . . . setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on[,] and . . .

-3-

for each issue, a concise statement of the applicable standard of review
. . . .").

In light of these deficiencies, we ordered that Bailey's brief be stricken pursuant to Rule 10(a) of the Rules of the Court of Criminal Appeals, we removed trial counsel, and we appointed appellate counsel to file a brief conforming to the requirements of the Tennessee Rules of Criminal Procedure. We also required both parties to follow a new briefing schedule outlined by the clerk of this court.

On September 13, 2016, this court granted a request from newly appointed appellate counsel to supplement the record with several proceedings in this case. On October 17, 2016, we granted the court reporter's motion for additional time within which to prepare these transcripts and ordered that they be filed with the trial court clerk no later than December 12, 2016. On December 7, 2016, this court filed an order setting forth a revised briefing schedule wherein appellate counsel would file a substitute brief in this matter on or before January 4, 2017, and the State would file a responsive brief within thirty days. Appellate counsel filed his brief on December 30, 2016, and requested oral argument in this case, and the State filed its responsive brief on January 31, 2017. Appellate counsel then filed a motion for extension of time to file his reply brief, which was granted, and counsel timely filed his reply brief on February 21, 2017. After hearing oral arguments in this case on August 15, 2017, this case is finally ready for our review.

**Trial.** We have summarized the proof at trial pertinent to the issues on appeal. Evidence was presented that the victim, Kima Evans, and the Defendant-Appellant, Kaylon Sebron Bailey, attended school together and became friends. During the course of their friendship, Bailey spent time at the Evans's home and knew the victim's mother, Anita Evans. Although the victim eventually moved out of his mother's home, he visited her there several times a week.

On January 13, 2012, the victim concluded his visit with his mother and informed her that he was leaving. Ms. Evans[2], who was in bed watching television, heard her son leave her home. At approximately the same time, Ms. Evans's neighbor, Chessie Burch, was washing dishes at her house. Ms. Burch knew her son was waiting on a friend to give him a ride. When she heard her dog barking, Ms. Burch looked outside to see if her son's friend had arrived and noticed a person walking down the street toward the Evans's home. After confirming that her son's friend was not in her driveway, she returned to

---

[2] Because several of the witnesses share the same surname, we will refer to them as "Mr." or "Ms." to distinguish them. We intend no disrespect to the other individuals in this opinion.

washing dishes. Approximately five minutes later, Ms. Burch heard several shots fired outside her home.

Ms. Evans also heard several gunshots fired in quick succession close to her home, and she dropped to the floor. After checking on her mother, she crawled to the front window. When Ms. Evans looked outside, she saw the victim's car and noticed that the driver's side door was open and that the car's headlights were on, although the engine was not running. At the time, the porch light and the front light of her home were illuminated, and the street light shone on the area of her driveway. She walked out on her porch, called her son's name, and asked if he had been shot, and he replied, "[Y]eah," and yelled for her to call 9-1-1. Ms. Evans immediately returned to the house and dialed 9-1-1. She walked outside and found her son in the passenger seat of his car with his head toward the back of the vehicle. As she approached him, the victim said, "Kaylon," and when it was clear she did not understand what he was saying, the victim stated, "Kaylon, Kaylon Bailey."

The recording from Ms. Evans's 9-1-1 call, took place at 7:27 p.m., and was entered into evidence. During this call, the victim can be overheard saying, "Kaylon Bailey shot me." A neighbor, Marethia Gholston, also testified that she heard the victim state several times that "Kaylon Bailey shot me."

Ms. Evans said that after the victim was silent for a moment, he told her he thought he was dying. The victim also lost consciousness one time, although this was not reflected on the 9-1-1 recording. Ms. Evans said she was aware that the victim had been shot on his back near his tail bone, although she did not know the full extent of his injuries. After checking on the victim, Ms. Evans, at the victim's request, looked around the victim's car for cell phones, money, and marijuana. She was able to find some marijuana and two cell phones, and she had Greg Burch, Ms. Burch's son, give these phones to Ms. Evans's mother, who was inside the home. Ms. Evans said she removed the cell phones from the vehicle because she did not want people to think that the victim's shooting was a "dope deal gone bad[.]" She acknowledged that she never gave these cell phones to the police.

Greg Burch also called 9-1-1, and the recording of this call was also entered into evidence. Mr. Burch told the 9-1-1 dispatcher that a shooting had occurred at his neighbor's home and that he had seen a man walking down the street just before he heard the shots fired. Mr. Burch stated he did not hear any raised voices or any conversation coming from the victim's home before hearing the gunshots. After the shots were fired, he walked over to help the victim and his mother and took a couple of the victim's cell phones away from the victim's car.

Ronald Smith, one of the paramedics at the scene, said he did not believe the victim would survive his injuries because of the severity of the gunshot wounds to his lower back, arm, and leg and the amount of his blood loss. While in the ambulance, the victim's condition worsened, and the victim told Smith that he had something to tell him "[a]bout the man who shot [him]." Although the victim's mouth was covered by an oxygen mask, Smith thought he heard the victim say, "Caleb Bailey." He said that although the victim's blood pressure was strong, the victim's condition deteriorated during the ambulance ride, and he eventually lost consciousness. Based on his ten years of experience as a paramedic, Smith said that most individuals, like the victim, who have lost a tremendous amount of blood know that they are about to die.

When the police arrived at the scene, officers discovered ten .223 caliber rifle casings, consistent with a semiautomatic assault rifle, on the ground behind and to the left of the driver's side door. Officers also collected three cell phones from inside the victim's vehicle and documented bullet holes in the front passenger door and window and in the front passenger seat of the vehicle. Testing by the Tennessee Bureau of Investigation revealed that all of the .223 caliber casings had been fired by the same firearm.

Shuneika Ricks, one of Bailey's friends, said that she spent time with Bailey the afternoon of the shooting. Before Ricks left for her son's basketball practice, Bailey left with his friend Lebron Johnson in Johnson's vehicle.

Shortly after 5:00 p.m., Bailey and Lebron Johnson visited Bailey's girlfriend, Buffy Johnson, who was at Deborah Mosley's home. During this visit, Ms. Johnson broke off the relationship with Bailey and refused to go to a professional basketball game in Atlanta with him. As Bailey was leaving, he gave Mosley a $500 debit card for Ms. Johnson, which Ms. Johnson refused to accept. Mosley stopped Bailey as he was leaving and returned the debit card to him.

Ricks saw Bailey again at her cousin's home between 8:00 and 9:00 p.m. At the time, Bailey did not appear nervous or stressed. A short time later, Bailey left in Ricks's vehicle, ostensibly for the purpose of buying something to drink at the liquor store and then returning to her cousin's home. When he left, Bailey forgot his cell phone, and Ricks noticed that her daughter and her cousin's daughter had removed the battery from the phone as they were playing with it. Ricks replaced the battery and charged the cell phone. When Ricks received a telephone call from a close friend, she got worried and asked her cousin to drive her around to look for her car. They found Bailey, but Bailey did not recognize the car Ricks was in, and he did not stop. At that point, Ricks contacted the police to report that Bailey had her vehicle.

Around 9:00 or 10:00 p.m., Mosley's neighbor called to let her know that there was an intoxicated individual on her porch who wanted to speak to her. When the neighbor handed this individual the phone, Mosley recognized it was Bailey. Mosley asked him, "[W]hat have you done[?,]" and Bailey replied, "I didn't know what I done did, come and get me." Mosley refused to pick up Bailey because she had heard he just shot someone. Mosley said Bailey did not seem to understand her when she accused him of shooting someone, and she admitted that Bailey's behavior that night seemed normal.

The following day, Bailey called Ricks and informed her that her vehicle was back at her house. Ricks later gave the police a backpack and a cell phone that Bailey had left at her cousin's home. The backpack contained a wig with dreadlocks that was attached to a hat. Cell phone records admitted into evidence established that there was a call to Bailey's cell phone that used two cell towers located in the downtown Chattanooga area at 5:56 p.m. on January 13, 2012. The records also showed that the cellular network could not locate Bailey's cell phone between 7:35 p.m. and nearly 8:56 p.m., which indicated either that the cell phone was out of range of a cell tower or had been powered off. Although there were incoming calls to Bailey's phone during the period from 7:35 p.m. to 8:56 p.m., these calls were unanswered. From 8:57 p.m. to 10:39 p.m., there were thirteen calls on Bailey's cell phone using the cell towers in the downtown Chattanooga area. When the police processed Ricks's vehicle, they discovered a partial palm print that matched the known palm print from Bailey.

Dr. Frank King, the Hamilton County Medical Examiner, testified that the victim survived for 16 days in a coma before dying from his injuries. While hospitalized, the victim underwent several surgeries in an attempt to save his life and was given 150 units of blood, fifteen times the amount of blood in a person's body. Dr. King opined that the victim's cause of death was multi-system organ failure due to multiple gunshot wounds. He identified at least five entrance wounds, but because of the extensive surgical intervention that took place, he was unable to precisely identify the path of each bullet that struck the victim. One bullet struck the victim in the back of the left elbow and traveled upward, fracturing the bone between the shoulder and the elbow, and exiting on the inside of the left arm. Two bullets struck the victim in the left upper chest and traveled downward through the body toward the victim's lower back. Another bullet hit the victim's left hip, traveled through his pelvis and into his abdomen, and likely exited at the victim's lower back. A bullet also entered the victim's leg, traveled upward into the victim's body, and went through the victim's right hip, pelvis, and abdomen. These gunshot wounds caused extensive injuries to the victim's left lung, diaphragm, bowels, pancreas, right kidney, left arm, right femur, and multiple bones in the pelvis. While at the hospital, the victim had complications with bleeding and infection and developed pneumonia.

-7-

The defense presented several witnesses who testified to Bailey's presence somewhere other than the crime scene on January 13, 2012. Sierra Johnson stated that her father, Lebron Johnson, and Bailey arrived at her family's home in Rossville, Georgia, around 7:00 p.m. on January 13, 2012, but she was unable to recall how long Bailey remained at her house that night. She acknowledged that her father was later arrested as an accessory after the fact in the victim's murder. Lebron Johnson, Jr., Sierra Johnson's brother, also testified that he remembered Bailey and his father arriving at their house in Rossville, Georgia a little after 7:00 p.m. They stayed at the house for thirty to forty minutes before leaving. Cindy Bailey, the Defendant-Appellant's mother, testified that on the evening of January 13, 2012, her son was with her nephew, Lebron Johnson, at her home sometime during the Wheel of Fortune television show, which ends at 7:30 p.m., or the Jeopardy television show, which airs immediately after, because she was watching one of these shows when they entered her home. Ms. Bailey said that her son's demeanor was normal that night.

## ANALYSIS

**I. Victim's Statements Identifying his Perpetrator.** Bailey argues that the trial court erred in admitting the victim's statements identifying his perpetrator to Anita Evans and Ronald Smith. Because the trial court properly admitted these statements under the dying declaration exception to the hearsay rule, Bailey is not entitled to relief.

Before his first trial, which resulted in a mistrial, Bailey filed a motion to suppress the testimony from Ronald Smith, a paramedic, regarding the victim's identification of his perpetrator. The purpose of that motion was to limit Smith's testimony to the fact that he heard the victim say "Caleb Bailey" shot him and to preclude any testimony that he heard the victim identify the perpetrator as "Kaylon Bailey." After a brief hearing consisting only of argument from counsel, the trial court denied the motion to suppress. It ruled that Smith would be required to testify to what he heard the victim say, and the State would be precluded from asking Smith directly if the victim could have said "Kaylon Bailey." However, the court said the State would be allowed to argue to the jury that the victim actually said "Kaylon Bailey" rather than "Caleb Bailey." The court held, "I would consider [the victim's statement] a dying declaration to the EMS worker. And the fact that he got something close and got the right last name I think it's relevant." A minute entry filed on March 18, 2013, also showed that this motion was denied.

Also prior to the first trial, Bailey filed a motion to suppress the victim's statements identifying him as the perpetrator of the offense. The motion sought to suppress this proof on the basis that the victim's statements were hearsay or double hearsay that did not fall within a hearsay exception. In a memorandum of law in support of these motions to suppress, Bailey argued that the victim's statements identifying him

as the perpetrator were not admissible as excited utterances because they were testimonial pursuant to Crawford v. Washington, 541 U.S. 36 (2004), that the statements, if not testimonial, would not satisfy the general requirements for an excited utterance, that the statements were inadmissible as a dying declaration because the victim did not make the statements while under the belief that his death was imminent, and that the victim's identification of Bailey as the perpetrator was influenced by other individuals on the scene.

At the hearing on this motion, which took place just before the start of Bailey's first trial, the victim's mother, Anita Evans was the only witness to testify. Ms. Evans said that after she heard the gunshots fired, she went outside and saw her son, the victim, in the passenger seat of his car. As she approached him, the victim immediately said, "Kaylon." When Ms. Evans asked him what he said, the victim replied, "Kaylon Bailey." The State then played the recording of Ms. Evans's 9-1-1 call. On cross-examination, Ms. Evans admitted that she looked for marijuana and money inside the victim's car because the victim smoked marijuana. The victim told her he had some cell phones inside his car, but Ms. Evans only found one cell phone, which she gave to a neighbor to give to Ms. Evans's mother. Ms. Evans admitted that she never gave this cell phone to police. When trial counsel asked Ms. Evans about the victim never saying he believed he was dying on the 9-1-1 recording, Ms. Evans replied that she believed her son thought he was dying at the time. She said her son's last words to her were as follows: "[M]amma, it hurts so bad." Ms. Evans added that although she did not know exactly what her son was thinking, her son had sustained several gunshot wounds and was bleeding internally at the time he identified Bailey. After he was taken to the hospital, her son was placed in a medical coma and died 17 days later. The State made as an exhibit the victim's autopsy report, which established that the victim suffered several gunshots wounds that caused injuries to the victim's left lung, diaphragm, bowels, pancreas, right kidney, and left arm, as well as fractures to the humerus, pelvis, and right femur.

At the conclusion of this hearing, the trial court held that the victim's statements identifying Bailey as the perpetrator of the offense were admissible as both an "excited utterance and dying declaration." Although the trial court did not rule on the admissibility of Ronald Smith's testimony regarding the victim's identification of his perpetrator, it stated that it wanted to conduct a jury-out hearing on the admissibility of Smith's testimony about the victim's identification of his perpetrator before Smith testified at trial. The transcript from the first trial shows that Bailey never renewed his objection to Smith's testimony at the first trial and never asked for a ruling from the trial court on his motion before Smith testified at the first trial.

After his first trial ended in a mistrial, Bailey filed a motion for the trial court to reconsider suppressing the victim's statements identifying him as the perpetrator, arguing that evidence developed at pre-trial hearings and at the first trial established that the victim's statements were not admissible under the dying declaration or excited utterances exceptions to the hearsay rule. At the subsequent hearing, trial counsel argued that although the victim had sustained serious injuries, the victim had a strong voice on the 9-1-1 recording, the victim orchestrated a cover-up of his drug activities by having his mother remove his cell phones, and the victim never made a statement that he believed he was dying. Trial counsel also asserted that if the trial court relied on the excited utterance exception to the hearsay rule to admit the victim's statements identifying Bailey as his perpetrator, then the court would have to engage in a Crawford analysis because the victim's statement was testimonial. Ultimately, the trial court held, "For the same reasons [as I stated before,] I still believe [the victim's statement identifying his perpetrator] was a dying declaration and an excited utterance so I'm going to overrule that motion to reconsider." A minute entry filed shortly before the second trial also showed that the trial court denied this motion to reconsider. Although Bailey renewed his objection to admission of the 9-1-1 recording at his second trial, which was overruled, he never objected to Evans's or Smith's testimony at his second trial regarding the victim's identification of his perpetrator.

The Tennessee Supreme Court has held that the appellate standard of review for rulings on hearsay evidence consists of multiple layers:

> Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. State v. Gilley, 297 S.W.3d at 760-61. Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule—are questions of law subject to de novo review. State v. Schiefelbein, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); Keisling v. Keisling, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005).

Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015).

-10-

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "[H]earsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. Here, the victim's out-of-court statement identifying Bailey as the perpetrator to Ms. Evans and Smith was hearsay. In admitting these statements, the trial court relied, in part, on the dying declaration hearsay exception in Tennessee Rule of Evidence 804(b)(2), which states that if the declarant is unavailable, the following evidence is not excluded by the hearsay rule:

> Statement Under Belief of Impending Death.—In a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing that the declarant's death was imminent and concerning the cause or circumstances of what the declarant believed to be impending death.

Tenn. R. Evid. 804(b)(2) (2010) (amended July 1, 2009). The theory underlying this hearsay exception is that a person facing imminent death will be truthful because the eternal consequences of dying immediately after uttering a lie are too great to risk. State v. Lewis, 235 S.W.3d 136, 148 (Tenn. 2007) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 8.35[2][a] at 8-155 (5th ed. 2005)). As the Tennessee Supreme Court recognized:

> "[W]hen the party is at the point of death, and when every hope of this world is gone, when every motive to falsehood is silenced, and the mind is induced by the most powerful consideration to speak the truth, a situation, so solemn and so awful, is considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a court of justice."

Lewis, 235 S.W.3d at 148-49 (quoting Smith v. State, 28 Tenn. 9, 19 (1848)). Within the context of a criminal prosecution, a statement must satisfy the following five elements in order to qualify as a dying declaration:

> (1) the declarant must be dead at the time of the trial;

> (2) the statement is admissible only in the prosecution of a criminal homicide;

> (3) the declarant must be the victim of the homicide;

-11-

(4) the statement must concern the cause or the circumstances of the death; and

(5) the declarant must have made the statement under the belief that death was imminent.

Id. at 149.   Hearsay statements that qualify as dying declarations are admissible in criminal trials even if they are testimonial, and the defendant has not had a prior opportunity for cross-examination.  State v. McCoy, 459 S.W.3d 1, 14 n.3 (Tenn. 2014) (citing Crawford, 541 U.S. at 56 n.6; Lewis, 235 S.W.3d at 147-48).

**A.  Victim's Statement to Anita Evans.**  Bailey argues that the trial court erred in admitting the victim's statement to his mother, Anita Evans, that Kaylon Bailey shot him. Although Bailey acknowledges that both Anita Evans and Marethia Gholston were allowed to testify about the victim's identification of him as the perpetrator, he claims that the "best evidence" of the victim's identification of Bailey as the perpetrator was the 9-1-1 recording, wherein the victim told his mother that Kaylon Bailey shot him.  Bailey claims that the victim's statement is hearsay and that because the victim did not believe his death was imminent at the time he made the statement of identification, the statement does not qualify as a dying declaration exception to the hearsay rule pursuant to Rule 804(b)(2).  See  Lewis, 235 S.W.3d at 148-49.  Alternatively, Bailey argues that the trial court erred in admitting this statement as an excited utterance.

Here, Bailey challenges the existence of the final element in Lewis, which requires the declarant to have made the statement under the belief of imminent death.   In determining whether this element is satisfied, "it is not necessary that the declarant have stated unequivocally his belief that his situation is hopeless."  State v. Branam, 604 S.W.2d 892, 895 (Tenn. Crim. App. 1980).  Instead, "[a]wareness of impending death may be inferred from the facts and circumstances, the language and condition of the declarant, and the seriousness of the wounds."  Id. (citations omitted).  The Tennessee Supreme Court has held that "where the wound is obviously of a desperate nature[,] the wounded man can scarcely contemplate it with any expectation of life."  Crawford v. State, 273 S.W.2d 689, 691 (Tenn. 1954).  Other circumstances indicating an awareness of impending death "include difficulty breathing, a frantic or frightened demeanor, fading in and out of consciousness, and final expressions of love to a romantic partner."  State v. Antonio M. Crockett, No. M2015-00566-CCA-R3-CD, 2016 WL 769890, at *15  (Tenn. Crim. App. Feb. 29, 2016) (citing State v. David Smith, No. W2009-02002-CCA-R3-CD, 2010 WL 2482326, at *7 (Tenn. Crim. App. June 17, 2010)), perm. app. denied (Tenn. June 23, 2016).

Bailey claims that the victim's "language and condition" on the 9-1-1 recording did not show an awareness of impending death and instead established only a concern that the police would find his drugs and six cell phones. See Branam, 604 S.W.2d at 895; Antonio M. Crockett, 2016 WL 769890, at *14-15. He argues that if the victim believed his death was imminent, he would not have been concerned about the police charging him with a crime. He also contends that many of the facts and circumstances used to determine whether a declarant is aware of his impending death were not present in this case. See Antonio M. Crockett, 2016 WL 769890, at *15. Specifically, he asserts that the victim did not have trouble breathing, that the victim's demeanor was not frantic or frightened, that the victim did not lose consciousness, and that the victim did not make any final expressions of love to anyone. See id.

Although the victim did not explicitly state that he believed he was dying when he identified Bailey as his perpetrator, the facts and circumstances surrounding the statement sufficiently establish the victim's awareness of his imminent death. At the time the victim made this statement, he had received at least five gunshot wounds from a rifle. These wounds resulted in serious injuries to the victim's left lung, diaphragm, bowels, pancreas, right kidney, left arm, right femur, and pelvis. Anita Evans, the victim's mother, testified that her son told her that he believed he was dying and actually lost consciousness one time. Ronald Smith testified that he did not believe the victim would survive because of the severity of his injuries and the amount of blood he lost. He also said the victim's physical condition worsened during the trip to the hospital. During the victim's treatment, he received 150 units of blood, fifteen times the amount of blood in a person's body. Because of his serious injuries, the victim was placed in a medical coma and died 16 days later. In light of the facts and circumstances in this case, we conclude that the trial court properly admitted the victim's out-of-court statement to his mother under the dying declaration exception to the hearsay rule.

Alternatively, Bailey argues that the trial court erred in admitting the victim's statement to his mother as an excited utterance. He contends that the statement was testimonial and that its admission violated the Confrontation Clause. He adds that even if this statement were nontestimonial, it does not meet the requirements for the excited utterance exception. Because we have already concluded that this statement was clearly admissible as a dying declaration, we need not consider whether the statement was also admissible as an excited utterance. In any case, we conclude that the victim's statement to his mother that Bailey shot him, which was given during an ongoing emergency, was nontestimonial hearsay and was admissible as an excited utterance.

"[A] statement is nontestimonial if the primary purpose [of the dialogue or exchange] is something other than establishing or proving past events potentially relevant to prosecution, such as providing or enabling assistance to resolve an ongoing

-13-

emergency." State v. Franklin, 308 S.W.3d 799, 817 (Tenn. 2010) (citing State v. Cannon, 254 S.W.3d 287, 302 (Tenn. 2008)). In determining the primary purpose of the dialogue or exchange, we must consider "the intent both of a reasonable person in the declarant's position and of a reasonable person in the questioner's position." Id.

The Tennessee Supreme Court has held that "identity-establishing responses amidst an ongoing emergency are nontestimonial when the victim responds to a private citizen's request for identification." Id. at 820. "Even after the actual crime has ended, the emergency may continue as long as the perpetrator might be found in the vicinity." Id. at 819. In this case, the victim made the statement identifying his perpetrator moments after being shot, and the immediate threat of the perpetrator returning to the scene constituted an ongoing emergency. See id. at 820. Because a reasonable person in the victim's position would have believed that the emergency was continuing and that he and others remained in danger, the primary purpose of the victim's statement was to receive aid and to capture the perpetrator, not to prove past events relevant to a later criminal prosecution. See id. Similarly, because a reasonable person in the mother's position would have also believed there was an ongoing emergency, the primary purpose of her statements during this exchange was to render aid to her son. See id. Moreover, the circumstances surrounding the exchange between the victim and his mother lacked the formality associated with affidavits, depositions, prior testimony, or confessions. See State v. Dotson, 450 S.W.3d 1, 63 (Tenn. 2014) (citing Crawford v. Washington, 541 U.S. 36, 51-52 (2004)). For all these reasons, we conclude that the victim's statement identifying his perpetrator was nontestimonial hearsay and that the admission of this statement did not violate Bailey's confrontation rights.

We must next determine whether the statement was admissible under the Tennessee Rules of Evidence. Under Tennessee Rule of Evidence 803(2), an "excited utterance" not excluded by the hearsay rule is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." In order to meet the excited utterance exception, (1) a startling event or condition must occur that suspends the normal, reflective thought processes of the declarant, (2) the declarant's statement must relate to this startling event or condition, and (3) the declarant must make this statement while under the stress or excitement from the event or condition. Franklin, 308 S.W.3d at 823 (citing State v. Stout, 46 S.W.3d 689, 699 (Tenn. 2001), superseded by statute on other grounds as stated in State v. Odom, 137 S.W.3d 572, 581-82 (Tenn. 2004); State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997)). Here, the startling event was that the victim had just been shot, the victim's statement identifying the shooter directly related to this startling event, and the victim made this statement while still under the stress of being shot. Therefore, we also conclude that the victim's statement identifying his perpetrator was admissible under the excited utterance exception to the hearsay rule.

-14-

**B.** **Victim's Statement to Ronald Smith.** Bailey also contends that the trial court erred in admitting testimony from Ronald Smith, a paramedic, regarding the victim's identification of his perpetrator as "Caleb Bailey." He again claims that the victim's statement did not constitute a dying declaration because the victim did not believe that his death was imminent at the time he made the statement. We conclude that the victim's statement to Smith is admissible as a dying declaration for the same reasons as stated in the previous section.

Bailey specifically claims that the victim did not believe that he was dying because he was able to have a casual conversation with Smith while in the ambulance. Although he acknowledges that the victim was losing blood and eventually lost consciousness, he asserts that the victim's blood pressure was within good limits. He also claims that the victim did not have any difficulty breathing, did not have a frantic or frightened demeanor, and did not make any final expressions of love to his girlfriend or mother.

We have already concluded that the facts and circumstances surrounding the victim's statement sufficiently establish the victim's awareness of his imminent death. Therefore, we conclude that the trial court properly admitted the victim's statement to Smith under the dying declaration exception to the hearsay rule.

**II.** **Sufficiency of the Evidence.** Bailey contends that the evidence is insufficient to sustain his convictions for first degree premeditated murder and possession of a firearm after having been convicted of a felony drug offense. He does not dispute that the elements of the crimes were established but asserts that, in light of the alibi evidence he presented at trial, the State failed to prove beyond a reasonable doubt his identity as the perpetrator. Because there was sufficient evidence presented for a rational jury to find beyond a reasonable doubt that Bailey was the individual responsible for these offenses, he is not entitled to relief.

When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was

-15-

legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact. Id.

"The identity of the perpetrator is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)).

Bailey essentially claims that the testimony from his alibi witnesses, all of whom were related to him, outweighs the testimony from the State's witnesses regarding his identity as the perpetrator. A review of the alibi testimony shows that while Sierra and Lebron Johnson, Jr., placed Bailey in Rossville, Georgia at the time of the offenses, Bailey's own mother stated that Bailey was in Chattanooga, only a short distance from the crime scene, around the time that the victim was murdered. As we previously noted, the jury resolves all issues regarding the weight and credibility of witnesses, including alibi witnesses. See Campbell, 245 S.W.3d at 335. "In the resolution of questions of fact, such as those presented by evidence of alibi or the identity of the perpetrator, 'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" State v. Pope, 427 S.W.3d 363, 369 (Tenn. 2013) (quoting State v. Hornsby, 858 S.W.2d 892, 297 (Tenn. 1993)); see Forbes v. State, 559 S.W.2d 318, 324 (Tenn. 1977); Cole v. State, 215 S.W.2d 824, 825 (Tenn. 1949); Smith v. State, 566 S.W.2d 553, 556 (Tenn. Crim. App. 1978). The evidence presented at trial established that the victim was unarmed and seated in his car when Bailey approached and fired at least five shots with a rifle at him. At the time of this incident, Bailey and the victim had known each other for many years, and Bailey had visited the victim at his mother's home. At the time of the shooting, Bailey's cell phone stopped

signaling any cell towers, and the jury could have found that he powered the cell phone off to prevent it from recording his location. Anita Evans and Marethia Gholston both testified that the victim identified Bailey as his shooter at the scene. Although Ronald Smith heard the victim identify "Caleb Bailey" as the perpetrator, the jury could have reasonably inferred that the victim actually identified "Kaylon Bailey" as his shooter. Bailey left a backpack, containing a cap and an attached wig, at Shuneika Ricks's cousin's home, indicating that Bailey concealed his identity during his commission of these offenses. Bailey admitted that he had been convicted of a felony drug offense at the time the offenses in this case were committed. It was the jury's prerogative to accredit the testimony of the State's witnesses over the testimony offered by Bailey's alibi witnesses, and we will not second-guess the factual determinations made by the jury. Ultimately, the jury heard Bailey's alibi defense and did not find it credible. Because there was sufficient evidence for a rational jury to find that Bailey was guilty beyond a reasonable doubt of both first degree premeditated murder and possession of a firearm after having been convicted of a felony drug offense, he is not entitled to relief.

Finally, we note some clerical errors in the judgments that require correction. In Count 1, the portion of the judgment form listing the conviction offense was left blank, and the statute for both the indictment offense and the convicted offense was incorrectly listed as Tennessee Code Annotated section 39-13-201, rather than Code section 39-13-202. Consequently, we remand the case for entry of a corrected judgment in Count 1 reflecting an indicted and conviction offense of first degree premeditated murder and a Code section of 39-13-202. In Count 2, the judgment incorrectly listed Code section 39-17-1324 as the relevant statute for the indicted offense of possession of a firearm after having been convicted of a felony drug offense. Therefore, we also remand this case for entry of a corrected judgment in Count 2 reflecting a Code section of 39-17-1307 for the indicted offense.

## CONCLUSION

Based on the aforementioned authorities and analysis, we affirm Bailey's convictions but remand the case for entry of corrected judgments consistent with this opinion.

_____
CAMILLE R. McMULLEN, JUDGE